HILARY POTASHNER (Bar No. 167060)
Federal Public Defender
LISA SHINAR LABARRE (Bar No. 246429)
(E-Mail: Lisa_LaBarre@fd.org)
JONATHAN C. AMINOFF (Bar No. 259290)
(E-Mail: Jonathan_Aminoff@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-5374
Facsimile: (213) 894-0310

Attorneys for Defendant
STEVE KIM

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STEVE KIM,<br><br>Defendant. | Case No. 2:18-cr-00901-TJH<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS THE INDICTMENT**<br><br>**Date: April 15, 2019**<br>**Time: 10:00 a.m.**<br>**Courtroom: 9B** |

Defendant Steve Kim, by his undersigned attorneys, will and hereby does move for an order dismissing the Indictment (dkt. no. 15) filed on December 21, 2018.

The motion is based upon the attached memorandum of points and authorities, all files and records in this case, and any further evidence and argument as may be presented before this Court on the motion.

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender

DATED: March 19, 2019

By */s/ Jonathan C. Aminoff*
JONATHAN C. AMINOFF
Deputy Federal Public Defender

Attorneys for Steve Kim

# TABLE OF CONTENTS

Page


MEMORANDUM OF POINTS AND AUTHORITIES ..... 1

I. INTRODUCTION ..... 1

II. RELEVANT FACTS ..... 1

III. ARGUMENT ..... 2

- A. The Genesis of 18 U.S.C. § 175 ..... 2
  - 1. The Biological Weapons Convention ..... 2
  - 2. The Biological Weapons Anti-Terrorism Act of 1989 ..... 3
- B. 18 U.S.C. § 175 does not reach the conduct in this case ..... 4
  - 1. The Supreme Court's Decision in *United States v. Bond* ..... 4
  - 2. Lower Courts Have Consistently Applied *Bond*'s Analytical Framework to 18 U.S.C. § 175 Prosecutions ..... 6
  - 3. Section 175 Does Not Reach Mr. Kim's Purely Local Attempted Assault ..... 8
- C. If 18 U.S.C. § 175 Does Reach Mr. Kim's Purely Local Conduct, Then § 175 Is Unconstitutional As It Exceeds Congress' Authority Under the Tenth Amendment ..... 11
  - 1. Congress Does Not Have the Power to Make Every Malicious Use of a Biological Agent a Federal Crime ..... 11

IV. CONCLUSION ..... 14

## TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Bond v. United States*,
564 U.S. 211 (2011)........................................................................................ 11

*Bond v. United States*,
572 U.S. 844 (2014)................................................................................... *passim*

*Cohens v. Virginia*,
6 Wheat. 264, 5 L. Ed. 257 (1821) ................................................................. 12

*Escambia County v. McMillan*,
466 U.S. 48 (1984)............................................................................................ 5

*Jones v. United States*,
529 U.S. 848 (2000)........................................................................................ 13

*McCulloch v. Maryland*,
4 Wheat. 316, 4 L. Ed. 579 (1819) ................................................................. 11

*Medellin v. Texas*,
552 U.S. 491 (2008)............................................................................................ 3

*Montana v. Engelhoff*,
518 U.S. 37 (1996).......................................................................................... 12

*Richardson v. United States*,
2018 WL 3352743 (E.D. TX May 9, 2018) ........................................................ 9

*United States v. Bass*,
404 U.S. 336 (1971)........................................................................................ 12

*United States v. Chamberlain*,
2016 WL 624940 (N.D. Cal. Feb. 10, 2016) .................................................. 8, 14

*United States v. Fox*,
95 U.S. 670 (1878).......................................................................................... 12

*United States v. Hale*,
762 F.3d 1214 (10th Cir. 2014) ..................................................................... 7, 8

*United States v. Levenderis*,
806 F.3d 390 (6th Cir. 2015) ................................................................ 4, 7, 9, 10

## TABLE OF AUTHORITIES

Page(s)

*United States v. Lopez*,
514 U.S. 549 (1995) .......... 11, 12, 13

*United States v. Morrison*,
529 U.S. 598 (2000) .......... 12, 13

**Federal Statutes & Authorities**

18 U.S.C. § 175 .......... *passim*

18 U.S.C. § 178 .......... 6

18 U.S.C. § 229 .......... 4, 5, 6, 7

Pub. L. No. 105-277 .......... 1, 3, 4

Pub. L. No. 101-298 .......... 3, 4

Pub. L. No. 104-132 .......... 3

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Congress' intent in enacting 18 U.S.C. § 175 was to "protect the United States against the threat of biological terrorism." Pub. L. No. 101-298, 104 Stat. 201, § 2(a)(2). This is not a terrorism case. Assuming the government's statement of facts is true, at worst, this is a case of attempted domestic violence, an issue traditionally and exclusively left to the states to police. As it was in the Supreme Court's decision in *Bond v. United States*, 572 U.S. 844 (2014), the government's effort to use a federal terrorism statute to reach purely local criminal conduct must be rejected. Whether the Court finds that § 175 does not reach Mr. Kim's conduct, or the Court concludes § 175 is unconstitutional as applied to Mr. Kim, the Indictment in this case should be dismissed.

## II. RELEVANT FACTS

Mr. Kim is charged in a single-count indictment with violating 18 U.S.C. § 175(a). Specifically, Mr. Kim is accused of knowingly attempting "to stockpile, transfer, acquire, retain and possess" ricin for use as a weapon. Dkt. No. 15 (Indictment).

The government alleges that Mr. Kim contacted an FBI Online Covert Employee masquerading as an online ricin seller on a dark-web marketplace website. Mr. Kim allegedly inquired about the "minimum order" that he could place for ricin. Dkt. No. 32 at 7-8. After some back and forth, the FBI agent and Mr. Kim settled on a quantity of ricin sufficient to harm a person weighing 110 pounds/55 kg. Dkt. No. 32 at 5. The FBI agent accepted payment and sent Mr. Kim what he claimed to be ricin, but what was actually an innocuous powder.

The government intends to argue at trial that when Mr. Kim purchased the ricin "it was for the purpose of trying to kill a 110 pound victim – likely his wife." *Id*. at 2:11-12. Moreover, the government contends that Mr. Kim's plan was to conceal the ricin in a drink that would be consumed by the 110-pound victim. *Id*. at 2:9-17.

## III. ARGUMENT

The government has stated that "it is without dispute that [Mr. Kim's] conduct constitutes a violation of 18 U.S.C. § 175(a)." Dkt. No. 32 at 2:15-17. False. The government's sweeping interpretation of 18 U.S.C. § 175 to apply to Mr. Kim's purely local conduct impermissibly expands Congress' enumerated powers, invades powers reserved to the States by the Tenth Amendment, and criminalizes conduct that lacks any nexus to a legitimate federal interest. Assuming the government's statement of facts are true, § 175 cannot apply. There are only two viable alternatives: strike down § 175 as unconstitutional as applied to Mr. Kim, or conclude that § 175 does not reach Mr. Kim's attempted common law assault. If the Court rejects both options, Mr. Kim respectfully requests a jury instruction that requires the government to establish jurisdiction.

### A. The Genesis of 18 U.S.C. § 175

#### 1. The Biological Weapons Convention

The Biological Weapons Convention ("BWC") is a multilateral disarmament treaty banning the development, production, stockpiling of, or otherwise acquiring or retaining, biological agents or toxins that have no justification for prophylactic, protective, or other peaceful purposes. BWC, Art. I.[1] The BWC, and the related Chemical Weapons Convention, were designed to supplement the 1925 Geneva Protocol, which prohibits use, but not possession or development, of biological and chemical weapons. Additionally, the BWC provides for the destruction of existing biological weapons (Art. II), it bars states from transferring weapons to other states, and bars states from aiding other states in obtaining biological agents (Art. III). The United States signed the treaty on April 10, 1972, and the BWC took effect on March 26, 1975.

As is typical of treaties, especially those addressing rules of warfare, the BWC imposes obligations on nation-states, not individuals. Indeed, the BWC calls on states

---

[1] Available at: https://www.state.gov/t/isn/4718.htm#treaty.

to create laws, within their respective "constitutional processes," to prohibit the biological weapon development within the state's borders (Art. IV). This provision establishes that the BWC is not a "self-executing" treaty, meaning that it does "constitute international law commitments" but does not "automatically have effect as domestic law." *Medellin v. Texas*, 552 U.S. 491, 504 (2008).

**2. The Biological Weapons Anti-Terrorism Act of 1989**

The Biological Weapons Anti-Terrorism Act (BWATA) was enacted on May 22, 1990 for the purpose of implementing the BWC and "protecting the United States against the threat of biological terrorism." Pub. L. No. 101-298, 104 Stat. 201. Largely mirroring the words of the BWC, the BWATA created 18 U.S.C. § 175 to encompass Articles I-III of the BWC.

Congress subsequently amended the BWATA via the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub. L. No. 104-132, 110 Stat. 1214. The amendment to § 175 was simply to add a provision criminalizing attempts, threats, and conspiracies under § 175(a), creating the present day statute, which reads: "Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin, or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States." Further, § 175(c) provides: "For purposes of this section, the term "for use as a weapon" includes the development, production, transfer, acquisition, retention, or possession of any biological agent, toxin, or delivery system for other than prophylactic, protective, bona fide research, or other peaceful purposes."

## B. 18 U.S.C. § 175 does not reach the conduct in this case

### 1. The Supreme Court's Decision in *United States v. Bond*

In *United States v. Bond*, 572 U.S. 844 (2014), the Supreme Court held that a "purely local" crime did not come within the confines of 18 U.S.C. § 229, the statute implementing the Chemical Weapons Convention.[2] Section 229 states that it is unlawful for any person knowingly "to develop, produce, otherwise acquire, transfer directly or indirectly, receive, stockpile, retain, own, possess, or use, or threaten to use, any chemical weapon." Section 229(f)(7)(A) removes criminal liability from individuals in possession of chemical weapons for "peaceful purposes."

In this case, defendant Bond learned that her husband was having an extramarital affair with their neighbor Myrlinda Haynes. Bond, who was employed as a microbiologist at a chemical manufacturer, then sought revenge against Haynes. Bond stole an arsenic-based compound from her employer and purchased a vial of potassium dichromate over the internet. Both chemicals are, in high enough doses, lethal to humans. 572 U.S. at 852. Over the course of the next seven months, Bond went to Haynes' home at least 24 times and spread the chemicals on Haynes' car door, mailbox, and door knob. Bond's intent was for Haynes to touch the chemicals and contract a rash. *Id*. On one occasion, Haynes touched the chemicals and suffered a minor chemical burn, but Bond's attempted assaults were otherwise unsuccessful. *Id*.

Bond was charged, inter alia, with one count of possessing and one count of using a chemical weapon in violation of 18 U.S.C. § 229(a). Bond appealed her conviction primarily on two grounds. First, Bond argued that § 229 as applied to her

---

[2] The parallels between § 229 and § 175 are well documented. "[B]oth § 229 and § 175 originate in the Geneva Protocol of 1925 and both are treaty-implementing statutes. Compare Chemical Weapons Convention Implementation Act, Pub. L. No. 105–277 div I, 112 Stat. 2681, 2681-856 (1998), with Biological Weapons Anti-Terrorism Act of 1989, Pub. L. No. 101-298, 104 Stat. 201 (1990). In addition, both § 229 and § 175 use expansive statutory language that, although not identically worded, outlaws any possession or use of a chemical or biological agent (which terms are expansively defined) that are not for a specific "peaceful purpose." Compare 18 U.S.C. § 229F with 18 U.S.C. § 175(c)." *United States v. Levenderis*, 806 F.3d 390, 397 (6th Cir. 2015).

exceeded Congress's enumerated powers and invaded powers reserved to the States by the Tenth Amendment. Second, she argued that § 229 does not reach her conduct because the statute's exception for the use of chemicals for "peaceful purposes" should be understood in contradistinction to the "warlike" activities that the Convention was primarily designed to prohibit. *Id*. at 853.

The Supreme Court, relying on the principle that "normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case," *Escambia County v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam), skipped Bond's constitutional claim and focused instead on whether § 229 reached her conduct. *Id*. at 856.

The government's argument in *Bond* was simple: Bond knowingly used a chemical weapon, as defined by the statute, when placing the chemicals on Haynes' property in an attempt to assault Haynes, which was not a peaceful purpose. *Id*. at 856-57. The problem with this interpretation, according to the Court, was "that it would 'dramatically intrude[ ] upon traditional state criminal jurisdiction,' and we avoid reading statutes to have such reach in the absence of a clear indication that they do." *Id*. at 857 (quoting *United States v. Bass*, 404 U.S. 336, 350 (1971)). The Court noted that it is appropriate to apply principles of federalism to resolve ambiguity in a statute, and that § 229 required such application because of the ambiguity derived from the broad reach of the term "chemical weapon," the consequences of adopting such a broad definition, and the lack of an apparent need to adopt such a broad definition. As such, the Court required a clear indication from Congress that the statute was intended to reach purely local crimes before the Court would interpret the statute's language in a way that infringes on the police power reserved to the States. *Id*. at 860.

With respect to the term "chemical weapon," notwithstanding the definition provided in the statute,[3] the Court stated that the natural meaning considers both the chemicals the defendant used and the circumstances in which she used them. *Id*. at 861. The Court found that the particular chemicals at issue were not the sort that an ordinary person would associate with chemical warfare. *Id*. And, relying on a definition of "weapon" as an "instrument of offensive or defensive combat" the Court found that Bond's action could not be described as combat. *Id*. Indeed, the Court drew a distinction between stating that someone "used a chemical weapon" and saying that someone "used a chemical in a way that caused some harm." *Id*. at 860. The Court explained that if Bond had used the exact same chemicals to poison the city's water supply, then the chemicals might be considered "chemical weapons," but applying that same usage to Bond's actions would give the statute a reach exceeding the ordinary meaning of the words used by Congress in drafting § 229. *Id*. at 861. The Court drew further distinction between Bond's "common law assault" and cases involving "terrorist plots or the possession of extremely dangerous substances with the potential to cause severe harm to many people." *Id*. at 864. The Court found that while the federal government had an interest in enforcing criminal laws against assassinations, terrorism, and acts with the potential to cause mass suffering, the cases of simple, purely local assaults were constitutionally left to the States. *Id*. at 863-64. Thus, the Court concluded, Bond's actions, while wrong, were not punishable under § 229.

### 2. Lower Courts Have Consistently Applied *Bond*'s Analytical Framework to 18 U.S.C. § 175 Prosecutions

Since the Court's decision in *Bond*, several circuit and district courts have applied *Bond* to § 175 prosecutions.

---

[3] The statute defines a "chemical weapon" generally as "a toxic chemical and its precursors…." 18 U.S.C. § 229F(1)(A). Similarly, "biological agents" are defined generally as "any microorganism… capable of causing death, disease or other biological malfunction…." 18 U.S.C. § 178(1)(A).

In *United States v. Levenderis*, 806 F.3d 390 (6th Cir. 2015), a case previously cited by the government in support of their prosecution of Mr. Kim (dkt. no. 32 at 3, 14), the Sixth Circuit considered the applicability of *Bond* to a prosecution under 18 U.S.C. § 175. There the Sixth Circuit found that because of the similarities between § 175 and § 229, the principles of *Bond* apply to § 175, and § 175 should be interpreted in light of federalism principles.

In that case, Defendant Levenderis was convicted of violating § 175 after producing 35.9 grams of ricin, enough to kill over 250 people, and intending to use the ricin as part of a suicide plot and against an unknown number of firefighters and first-responders, and to threaten his cousin, and to poison his step-father. *Id*. at 393, 399. The Sixth Circuit, applying *Bond*'s statutory analysis, focused on the biological toxin at issue and the manner and circumstances in which the defendant used them. The court found that ricin met the first hurdle, as ricin is a dangerous toxin of the kind that may be associated with biological warfare. The Ninth Circuit has not yet decided whether, post-*Bond*, ricin meets the first hurdle of the analysis.

And the court found that Levenderis' intended use of ricin was more akin to terrorist plots and possession of extremely dangerous substances with the potential to cause severe harm to many people than a common law assault. *Id*. at 398. In support of this conclusion, the court emphasized the amount of ricin in Levenderis' possession (enough to kill over 250 people) and the fact that he intended to expose a potential large number of first responders to the poison. *Id*. at 399. This analysis is consistent with *Bond* where the Court cited to several § 229 prosecutions, each one involving either indisputable terrorist activity (such as attacking a federal courthouse) or plots where numerous people were placed at risk of harm. Mr. Kim is unaware of any prosecution where a defendant was convicted under § 175 that was not either a terrorist-related crime or a crime that subjected many people to potential harm.

In *United States v. Hale*, the Tenth Circuit also adopted the *Bond* analytical framework, but denied Hale's claim that his conviction was called into question by

*Bond*. There, "In retaliation against an official's discharge of her duties as an officer of the court, Hale claimed to send a deadly virus through the mail." 762 F.3d 1214, 1225 (10th Cir. 2014). The court concluded that this conduct was "'in natural parlance' referred to as 'terrorism.'" *Id*. (quoting *Bond*, 572 U.S. at 861).

In *United States v. Chamberlain*, a prosecution under §175(a) and (b) for possession of the biological toxin abrin, the district court also adopted *Bond*'s analytical framework. There, the disputed issue was how much albrin the defendant possessed. The government had originally argued that Chamberlain possessed up to 2,000 lethal doses, but as the case moved closer to trial, that number became increasingly disputed. The court determined that absent a showing that Chamberlain's conduct subjected many people to potential harm, the government would lack jurisdiction for its prosecution. Accordingly, the court instructed the jury, inter alia, that: "you may not convict the defendant of this charge unless you also find, beyond a reasonable doubt, considering both the particular toxin and the circumstances surrounding the defendant's possession of it, that there was a potential for severe harm to many people." *United States v. Chamberlain*, No. 14-CR-00316-VC-1, 2016 WL 624940, at *1 (N.D. Cal. Feb. 10, 2016). Unlike *Chamberlain*, here there is no dispute as to the amount of ricin Mr. Kim attempted to purchase: a quantity sufficient to harm only a 110-pound person.

**3. Section 175 Does Not Reach Mr. Kim's Purely Local Attempted Assault**

Here, Mr. Kim is accused of attempting to obtain ricin for the purpose of harming a single 110-pound victim. Applying the *Bond* framework, the Court considers the biological toxin at issue, and the manner and the circumstances of its intended use. As a matter of first impression, Mr. Kim does not concede that ricin falls within the type of biological agent that would be associated with biological warfare. Section 175(a) has a mens rea requirement of "knowing" and there is no evidence to indicate that Mr. Kim knew anything about ricin aside from the fact that it can, in high

enough doses, be lethal. Mr. Kim acknowledges that other courts have found that ricin meets the first step of the analysis, but in those cases the defendants were much more familiar with ricin and its toxicity. *See, e.g., Levenderis*, 806 F.3d 390.

Regardless, the charge fails at the next two steps. The manner with which Mr. Kim intended to use the ricin supports a finding that he was not using the ricin "as a weapon" in the sense contemplated by the statute. As the Supreme Court noted, there is a difference between using a chemical weapon and using a chemical in a way that caused harm. *Bond*, 572 U.S. at 860. Certainly, when Bulgarian dissident Georgi Markov was stabbed with a modified umbrella, which injected him with ricin, by the Bulgarian Secret Service, this was a biological weapon attack and unquestionably an assassination. Or when fringe activists sent ricin-tainted letters to Presidents Obama and Trump, that was a biological weapon attack and an act of terrorism. *See, e.g., Richardson v. United States*, 2018 WL 3352743 (E.D. TX May 9, 2018) (successful prosecution under § 175 for sending ricin-tainted letters to then-President Obama). But Mr. Kim's plot to place ricin in his wife's drink does not fit that bill. Indeed, if Bond's actions, which included 24 attempts and successfully burning Haynes, did not meet the definition of a chemical weapon attack, then Mr. Kim's alleged plan to poison his wife could not be considered a biological weapon attack. Both acts are simple common law assaults stemming from apparent domestic disturbances which the Supreme Court held in *Bond* was beyond Congress's reach, and beyond their intent in enacting the statutes. *Id*. at 862-63.

And finally, the circumstances of the intended use of the ricin are more akin to a common law assault than an act of terrorism or act with the potential to cause mass suffering. Indeed, as the government pointed out, Mr. Kim inquired of the seller about purchasing the "minimum" amount of ricin and ultimately purchased enough ricin to harm only a 110-pound victim. As the government alleges that Mr. Kim intended to put the ricin in his wife's drink and only purchased enough ricin to harm a 110-pound victim, there was no potential to cause any suffering beyond harm to his wife, and

clearly no potential for mass suffering. This is not a case like *Levenderis* where the defendant possessed a massive amount of ricin sufficient to kill hundreds of people. Indeed, even Bond's actions subjected more people to potential harm when she spread the toxic chemicals on Haynes' property including her mailbox, where federal postal employees could have been affected. And this is also not a case like *Hale*, where the defendant's conduct would, in the natural parlance, be referred to as terrorism.

The government now claims, in their reply in support of the motion in limine (dkt. no. 36), that Mr. Kim's purchase of ricin presented a "serious danger to the U.S. Mail, first responders, and the general public…." Dkt. No. 36 at 5. However, the government's statement of facts belie these claims. First, the undercover FBI agent expressed to Mr. Kim that he had previously shipped ricin powder and had "no issue." Dkt. No. 32 at 5:26. Moreover, the agent stated that he had a contact at the post office and advised Mr. Kim that the contact was presently on vacation, and that they should not ship until the contact has returned as "it [is] much safe[er] for all to send when [the] contact is back." *Id*. at 7:22. Mr. Kim agreed to wait until the agent's contact returned. *Id*. at 7:25. Second, the alleged ricin was concealed in the battery pack of a toy truck, which required a "special tool" to be accessed. *Id*. at 9:22. The FBI agent sent Mr. Kim a wrench to use to open the battery pack. Only Mr. Kim and the FBI agent were aware of the location of the alleged ricin and how to access it. If a 110-pound or less United States Postal Worker had opened the box, taken the toy truck out of its packaging, somehow figured out how to open the battery pack, opened the battery pack, removed the fake ricin, and then ingested the fake ricin, there is a theoretical possibility that the person could have been seriously harmed. However, this possibility is so attenuated that it cannot be what Congress intended to punish. Indeed, if Bond's actions did not pose a danger to postal employees when she received some of the chemicals at issue in the mail and placed those chemicals on Haynes' mailbox where a postal employee would likely come in direct contact with them, then certainly Mr. Kim's actions did not pose a serious danger to postal employees.

The government also contends that use of ricin creates a danger to the public and any first responders. Dkt. No. 36 at 8:19-21. The government does not explain, or offer any authority, in support of this proposition. It is also unclear how, if Mrs. Kim had ingested the ricin, that would have subjected first responders or the public to any danger.

Because Mr. Kim's actions do not constitute terrorism, an assassination, or an action with the potential to cause mass suffering, his actions do not come within the proscribed territory of 18 U.S.C. § 175.

### C. If 18 U.S.C. § 175 Does Reach Mr. Kim's Purely Local Conduct, Then § 175 Is Unconstitutional As It Exceeds Congress' Authority Under the Tenth Amendment

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. Amend. X. Section 175 violates the Tenth Amendment because it breaches the principles of federalism by permitting federal prosecution of localized offenses such as domestic violence, and is not based on a valid exercise of constitutional authority. Like the chemical weapons statute at issue in *Bond*, § 175 does not contain a federal interest element or state a constitutional basis for its enactment. Mr. Kim has standing to raise this jurisdictional issue. *Bond v. United States*, 564 U.S. 211 (2011).

#### 1. Congress Does Not Have the Power to Make Every Malicious Use of a Biological Agent a Federal Crime

The National Government possesses only limited powers; the States and the people retain the remainder. The States have "police power," which is the broad authority to enact legislation for the public good. *United States v. Lopez*, 514 U.S. 549, 567 (1995). The Federal Government, by contrast, has no such authority and "can exercise only the powers granted to it," *McCulloch v. Maryland*, 4 Wheat. 316, 405, 4 L. Ed. 579 (1819), including the power to make "all Laws which shall be necessary and

proper for carrying into Execution" the enumerated powers, U.S. Const., Art. I, § 8, cl. 18.

There is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). "Under our federal system, the 'States possess primary authority for defining and enforcing the criminal law.'" *Lopez*, 514 U.S. at 561 n.3 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1992)); *see also Montana v. Engelhoff*, 518 U.S. 37, 43 (1996) (plurality opinion) ("preventing and dealing with crime is … the business of the States"). None of this is to deny Congress' ability to enact criminal statutes. But the federal government may step into the States' traditional criminal realm only when it targets conduct that implicates matters of national or international, not just local, concern. "Were the Federal Government to take over the regulation of entire areas of traditional state concern," rather than limiting its laws to matters of distinctly federal concern, "the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory." *Lopez*, 514 U.S. at 577 (Kennedy, J., concurring); *see Cohens v. Virginia*, 6 Wheat. 264, 428, 5 L. Ed. 257 (1821) ("Congress cannot punish felonies generally.") and *United States v. Fox*, 95 U.S. 670, 672 (1878) (A criminal act committed wholly within a State "cannot be made an offence against the United States, unless it have [sic] some relation to the execution of a power of Congress, or to some matter within the jurisdiction of the United States.").

In keeping with that basic division of power, the Supreme Court has never accepted the argument that Congress may regulate criminal conduct with no nexus to matters of federal concern. Indeed, the Court is typically unwilling to assume that Congress even attempted to "dramatically intrude[] upon traditional state criminal jurisdiction" in this impermissible manner. *United States v. Bass*, 404 U.S. 336, 350 (1971) (construing federal firearms statute not to reach every possession of a firearm); *see Bond*, 572 U.S. 844 (construing federal chemical weapons statute to not reach every

incidence of an assault committed with chemical weapons); *Jones v. United States*, 529 U.S. 848, 855 (2000) (construing federal arson statute not to reach every building). And in the rare instances when the inference that Congress actually intended such an intrusion is unavoidable, the Court has not hesitated to hold the law unconstitutional. *See, e.g.*, *Lopez*, 514 U.S. at 567 (holding unconstitutional federal law that sought to criminalize possession of a gun in a local school zone); *Morrison*, 529 U.S. at 617 (holding unconstitutional federal law that sought to regulate all gender-motivated crimes of violence).

There can be no serious dispute that a federal effort to criminalize every malicious use of biological agents throughout the Nation could not be reconciled with these fundamental principles. Poisonings and assaults involving harmful substances were not unknown to the Framers. Yet it would have been unthinkable to the Framers that such matters would be anything other than a state concern. To be sure, there is some small subset of such crimes that touches on matters of federal concern. Even the Framers would recognize that attempting to poison political figures would come within the federal ambit. And more recently, few would doubt that there is a distinct federal interest in eliminating the use of biological agents to perpetrate acts of terrorism. But a statute that purported to federalize every malicious use of a biological agent, without regard to whether that use has any nexus to a distinct federal interest, would remain a non-starter. To accept any theory of federal power that would permit Congress to usurp the core criminal jurisdiction of the States "would require" this Court "to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated." *Lopez*, 514 U.S. at 567.

Here, Mr. Kim's actions constitute, at worst, preparations made for an act of domestic violence, an act traditionally left to the states to prosecute. Because this incident does not involve an act of war, assassination, or terrorism, there is no federal interest in pursuing this charge. Accordingly, if § 175 is deemed to reach Mr. Kim's actions, then § 175 is unconstitutional as applied to Mr. Kim.

## IV. CONCLUSION

For the foregoing reason, Mr. Kim respectfully requests that the Court dismiss the Indictment because § 175 does not reach Mr. Kim's alleged conduct, or § 175 is unconstitutional as applied to Mr. Kim.

If the Court decides that the Indictment survives this motion, Mr. Kim respectfully requests that, consistent with *Chamberlain,* the Court instruct the jury that: "you may not convict the defendant of this charge unless you also find, beyond a reasonable doubt, considering both the particular toxin and the circumstances surrounding the defendant's attempted acquisition of it, that there was a potential for severe harm to many people."

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender

DATED: March 19, 2019

By */s/ Jonathan C. Aminoff*
JONATHAN C. AMINOFF
Deputy Federal Public Defender

Attorneys for Steve Kim