UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

THE HON. JUDGE TERRY J. HATTER, JUDGE PRESIDING

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | |
| vs. | ) | NO. 18-CR-0901-TJH |
| STEVE S. KIM, Defendant. | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Monday, May 20, 2019

Lisa M. Gonzalez, CSR 5920, CCRR
Official Reporter
United States District Courthouse
350 West 1st Street, Suite 4455
Los Angeles, California 90012
(213) 894-2979
csrlisag@aol.com
www.lisamariecsr.com

APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
BY: REEMA EL-AMAMY
ASSISTANT UNITED STATES ATTORNEY
TERRORISM AND EXPORT CRIME SECTION
United States Courthouse
312 N. Spring Street
Los Angeles, California 90012
213.894.0552

FOR THE DEFENDANT: FEDERAL PUBLIC DEFENDER'S OFFICE
BY: LISA S. LaBARRE
JONATHAN C. AMINOFF
DEPUTY FEDERAL PUBLIC DEFENDER
321 East Second Street
Los Angeles, California 90012
213.894.1476/2854

Los Angeles, California; Monday, May 20, 2019;

11:10 a.m.

-o0o-

THE CLERK: Item Number 7, criminal case 18-901, United States of America versus Steve S. Kim.

MS. EL-AMAMY: Good morning again, Your Honor. Reema El-Amamy on behalf of the United States.

THE COURT: Thank you.

MR. AMINOFF: Good morning, Your Honor. Deputy Federal Public Defender Jonathan Aminoff and Lisa LaBarre with Mr. Kim, who's present in custody this morning.

Your Honor, we're here on a couple of motions this morning. There's my motion to dismiss and then the Government's motion to preclude the defense from arguing that suicide's a defense to this charge.

I understand from Ms. Skipper that the Court's interested in hearing oral argument on the motion to dismiss, so I plan to begin there, and then address the Government's motion if need be.

The Government lodged several documents last week, and I haven't had a chance to respond to those, so my intention is to begin the argument and then reserve the balance of my 15 minutes for rebuttal.

THE COURT: Very well.

MR. AMINOFF: Thank you.

Your Honor, Congress's intent in enacting 18, U.S.C. 175 was to enact the Biological Weapons Convention and protect the United States against biological terrorism. This is not a terrorism case. Mr. Kim is accused of, at worst, attempted domestic violence. It's a single-count indictment and we're asking on the basis of the U.S. Supreme Court's decision in *Bond* to dismiss the case.

Just taking a few minutes to speak about *Bond*. That case was about the Chemical Weapons Convention, and there the Supreme Court found that Section 229 could not encompass a purely local assault.

The facts of that case very similar to the facts here. The defendant in that case ordered chemicals online and also stole them from her employer, used them to create a chemical compound and then put them on her next-door neighbor's home and mailbox and car for the purpose of chemically burning her neighbor.

The Supreme Court there said that that was a purely local assault. So unless the crime involved an assassination, terrorism or something with potential to cause mass harm, the Supreme Court wasn't going to find that 229 encompassed that crime.

Several circuit courts have found that *Bond* applies with equal force to Section 175, including the Second Circuit, the Tenth Circuit and the Sixth Circuit.

The Ninth Circuit hasn't actually dealt with it yet, but the Government hasn't disputed that it should apply to Section 175.

Here, the first step of the analysis is to decide whether Mr. Kim's conduct constituted a purely local assault. Our position is obviously that it did.

Mr. Kim, just like the defendant in *Bond*, attempted to order a biological toxin online, he then received it through the mail, and he allegedly planned a purely local assault, i.e., attacking his wife.

If the Court does find that that conduct is purely local, the analysis is very simple.

First, we look at the biological toxin at issue, which in this case is ricin, and the Court considers whether ricin is a biological agent of the type that would be used in biological warfare. The Ninth Circuit hasn't touched on the issue. I did acknowledge in my papers that other circuits have, but that's not the end of the analysis.

The next two steps look at the manner of use and the circumstances of the use.

With respect to the manner of the use, the Court considers whether this was the type of action that would be described as deployment of a biological weapon. I think it's quite clear that if Mr. Kim had completed the assault, no one would consider that a biological weapon was deployed

in the Central District of California any more than they would have in the *Bond* case.

The final step of the analysis is looking at the circumstances of the offense, whether this is terrorism, assassination or an act with the potential to cause mass harm.

Clearly, that's not the case, and the Government does not argue otherwise. In fact, with all three of these points, the Government does not argue otherwise. Their entire argument is that this was not a purely local assault. And for that point, they rely exclusively on the *Lee* case out of the Second Circuit.

*Lee* doesn't apply here for a couple of reasons. First and foremost, *Lee* was analyzed under plain error review, which does not apply here. This issue was not raised in *Lee* pretrial. The Government's filing of the jury instructions in *Lee* have no bearing on anything.

Secondly, *Lee's* actions were plainly terroristic in nature, and that's what the Second Circuit found. The Second Circuit also found that ricin is inherently dangerous and therefore it trumps the rest of the analysis. No other court has adopted that, and that's not what *Bond* says. *Bond* very clearly says the analysis of the weapon is the type of weapon used and the manner and circumstances.

Thank you, Your Honor. I'd like to reserve the

balance of my time.

THE COURT: Thank you.

MS. EL-AMAMY: Yes, Your Honor. I'd like to reserve the balance of my time for when we move on to the jury instruction issue.

Your Honor, the parties just fundamentally disagree on the law in this case. The Government does not accept defendant's representations regarding analysis in this case. And, in particular, the three-step-prong case that the defendant mentions on the last page of his reply.

Now, stepping back, this case -- the control of ricin has an effect on interstate commerce and certainly there's an effect on interstate commerce as it was applied in this case.

And *Lee* is the controlling case in this case, and I would encourage the Court to look closely at it. Indeed, the case went up to the Supreme Court and cert was denied. It drew a very clear distinction between the very unusual circumstances in *Bond* which involved a chemical substance that involved very little harm and the dangerous toxin involved in ricin, which is this case.

Now, in this case, the defendant was engaged in activities that affected interstate commerce fully within the scope of activities that Congress is able to control.

In this case, he used the Internet to communicate

with somebody who he believed to be out of the country. He used it to purchase this dangerous toxin. He ordered it through the United States Postal Service. He used cryptocurrency to pay for the dangerous toxin, and he had it shipped to a commercial building in downtown Los Angeles.

Now, there is evidence in the record that this defendant knew that he was dealing with someone or believed that he was dealing with someone out of the country. He asked specifically about the price to ship the materials from outside of the country to Los Angeles. He asked for the price of ricin in euros, not dollars. He translated the weight of the intended victims into kilograms, which is somebody -- to make sense for somebody who's outside of the country who deals in weight outside of the country as opposed to pounds which is in the United States.

So this defendant clearly knew that he was or believed that he was dealing with somebody outside of the country. And on its face, 175, as it applies to this defendant's conduct, is constitutional. The *Lee* case makes that clear.

Now, defense tries to draw minor distinctions with other cases, however, there is no case that respectfully, in the Government's view, supports reading *Lee* differently and as to not apply to this defendant.

Moreover, Your Honor, the defendant did not

acknowledge the citation to the United States Supreme Court regarding the treaty powers of Congress. In this case, there is no contention that the Biological Weapons Convention is a valid treaty, and Congress has the authority to enact laws, to enact those treaties. And in this case, that is exactly what they did. And again, that is too discussed in the *Lee* case and in other cases throughout the country.

Your Honor, I believe in this case that the law is clear that there is no basis to support a dismissal based on federalism or jurisdictional issues. There has been no case that the defendant has cited anywhere in the country in which a case account of this nature was dismissed prior to trial.

Now, if the Court finds that after the introduction of evidence and the jury has had the opportunity to listen to all the evidence in this case, which they have not done yet and findings of fact are within the purview of the jury, if the Court finds at that point that insufficient evidence has been met to support the Government's evidence in this case, including the jurisdictional elements, then that's a different issue.

However, in this case, the Government respectfully submits that it would be inappropriate on this record for the Court to find that there's a basis for dismissal when

the charge in this case appears on its face to be valid. It is supported by conduct that, at least as appears to a grand jury, has been found to support the charge. The Government has made an initial proffer based largely on the defendant's own statements which were submitted to the Court that he knew or believed that he was dealing with activities that affected interstate commerce. And the Government simply and strenuously maintains that there is no basis at this point for the Court to dismiss the indictment.

THE COURT: Thank you.

MR. AMINOFF: Thank you, Your Honor. I'd like to just talk about the *Lee* case for a moment. In that case, the defendant there was intent on building a ricin network whereby he would sell what he was calling murder pills to various people. The Second Circuit found that was a core concern of what this treaty was supposed to be protecting against. This was not an incident where the person was looking to harm one person. This guy was looking to supply people with murder pills, so people could pull off the perfect murder. It was quintessentially terrorism, and the type of thing that was likely to produce mass harm.

That is contrasted with this case where Mr. Kim bought the minimal amount of ricin that he could. Only enough to harm someone who was 110 pounds. There's no possibility here that this was an action that could harm

more than one person. The Government doesn't even argue that this is terrorism. There's no way that you can look at this and decide this is terrorism.

Yes, the *Bond* case has been described as unusual. That's because, as the Supreme Court acknowledged, that it was the only time that the Supreme Court could ever find a case where someone was charged with 229 for something as minor as trying to poison their next-door neighbor.

In the same way, Mr. Kim's case is profoundly unusual because the Government is looking to charge him with a terrorist statute for domestic violence, which is an area that's exclusively left to the states to police.

The Government's characterization of Mr. Kim's statement, I think is not accurate at all. I don't recall any time when he asked for the price in euros. He asked for the shipping price, which there's a shipping price on something that's delivered from anywhere. That doesn't mean this was international. And when he provides the weight, he provides it first in pounds and then in kilograms. There was no discussion as to where the seller was located.

Also, I asked the Government to file the audio recording of the transcript, which they said they would do. I can't speak to the accuracy of the transcript they filed. The first time I saw it was last week. So as soon as I get back to my office today, I will lodge the audio recording of

the transcript and request that the Court -- if the Court's going to review what happened in that interrogation, to listen to the audio recording because that's, under the best evidence rule, the most accurate piece of evidence.

Again, yes, Mr. Kim used the Internet and the mail, but so did *Bond*. And the Government doesn't even address this. That's the exact same factual scenario, and the Supreme Court there was very explicit that *Bond's* actions do not come within the statute the exact same way Mr. Kim's don't.

And the difference between ricin -- I would just like to point out that the Supreme Court found in *Bond* that the chemicals at issue came within the statutory definition. The fact that ricin is used here and the chemicals there were something different doesn't change anything.

Finally, one last thing. The case that I've been citing, *Levenderis*, out of the Sixth Circuit was another ricin case. In that case, the defendant used the Internet to learn how to make ricin. So there was a question there of use of the Internet there as well. The Sixth Circuit applied the same *Bond* analysis that I'm asking the Court to apply today and that the Supreme Court applied. Every other case has applied the same *Bond* analysis. The fact is the Ninth Circuit just hasn't dealt with this yet, but every case that I have cited applies the *Bond* analysis. It is

only the Second Circuit that somehow finds that ricin trumps the analysis, but then in the alternative, they apply the full *Bond* analysis and find that Mr. Lee met all the various steps of *Bond*.

THE COURT: Let me ask you --

MR. AMINOFF: Yes, Your Honor.

THE COURT: -- is there agreement that there are three elements to this particular crime, as charged in this statute, 175(a), first, that the defendant knowingly attempted to transfer and acquire something. Are we together on the first element?

MR. AMINOFF: I'm sorry. I'm just trying to grab my copy of the statute.

So the first element --

THE COURT: Is that the defendant knowingly attempted to transfer or acquire something?

MR. AMINOFF: Yes.

THE COURT: Second, that what the defendant tried to transfer or acquire was a biological agent or toxin?

MR. AMINOFF: Yes.

THE COURT: And third, that the defendant tried to acquire or transfer this biological agent or toxin for use as a weapon?

MR. AMINOFF: Yes, Your Honor. I agree with that.

THE COURT: And isn't it fairly clear too that the

attempt to acquire a biological agent or toxin with the intent that it be used to injure or harm another person or persons. It doesn't have to be multiple persons, does it?

MR. AMINOFF: No, it does not, Your Honor. Like an assassination, for example. It can be a single person.

THE COURT: So why is this case outside of that context?

MR. AMINOFF: Why is it outside of this context? Because the Supreme Court in *Bond* when it analyzed what that meant was very clear that it had to be something more than a simple assault. It had to be something different.

So there's a valid prosecution out of Texas, for example, where someone sent ricin poison to President Obama. That's a valid use of this statute. It's something more than a simple assault. It has to be something that -- multiple countries would get together and sign a treaty to protect against.

We all agree that the purpose of this statute is to protect against terrorism. It's not local conduct like this. I mean, if it was just -- if it was just harming one other person, then *Bond's* guilty. There's no question. The defendant in *Bond* poisoned her next-door neighbor. She burned her finger. She tried on 24 occasions to burn this woman, and she succeeded. So if that's all it took, the Supreme Court wouldn't have reversed the case.

THE COURT: Thank you.

MS. EL-AMAMY: Your Honor, first, the Government disagrees with the characterization of this as a local domestic violence incident. This was attempted murder. This defendant was intending to murder an individual, and it might not have been the defendant's wife. It was an individual who weighed a certain amount. Don't know if that individual was even in the state at this point. I don't know what Defendant Kim was trying to do with the ricin, other than attempt to kill an individual who was 110 pounds.

THE COURT: What makes it terrorism?

MS. EL-AMAMY: Well, there is no requirement that it be a terrorism offense, Your Honor. I would urge the Court to look at the case law because I believe that the arguments that the defense has been lodging are not accurate. There is no requirement in the statute that the conduct be, quote, terrorist offense.

In fact, multiple statutes, for example, 18, United States Code 2339(a) is material support to terrorist activities. No requirement in the statute that the individual that is being supported is actually a terrorist.

So the Government rejects that argument and would urge the Court not to adopt it.

Additionally, the *Lee* case does have discussion about ricin being used against just one person as opposed to

multiple individuals and also finds that Congress has an interest in regulating that because ricin is a highly deadly substance.

And again, I think this is where we're going into the line of what we should present to a jury. Defense has argued in this case that the ricin that the defendant ordered had no possible harm of harming other individuals. Ricin is a highly deadly toxin. It can be accidentally opened, it can be accidentally inhaled. It was being put through the United States Postal Service. It did have the ability in the way that the defendant was ordering it to harm multiple people.

THE COURT: And in the way that he maintained it?

MS. EL-AMAMY: In the way that he maintained it -- he didn't have a choice in terms of how he maintained it. And the Government would submit that if the defense -- basically the way it was maintained was for investigative purposes. We wanted to arrest the individual who purposely accessed the ricin in this case. We wanted to know who opened the compartment to get the ricin, so that we could identify the correct person, as opposed to, for example, Defendant Kim's wife accidentally opening the package and saying, "I had no idea what was in it."

THE COURT: If indeed that were to occur, wouldn't that in and of itself show that there's a danger in having

this?

MS. EL-AMAMY: Absolutely, Your Honor. And the Government would submit that this defendant didn't question the UC about: Is this safe to transport? Will this harm other people in the United States Postal Service or in my mail room, for example? And if the undercover operative would have said, "I'm just going to stick it in the mail for you in a little vial and ship it on through," the Government sincerely doubts that the defendant would have an issue with it.

So in this case, there is a strong federal and congressional interest in regulating these activities.

And the Government again notes that the *Lee* case is the most recent in time. It was decided by the Second Circuit in 2018. The Supreme Court looked at this in 2019 and did not have an issue with its analysis and did not grant cert.

The Government submits that the *Lee* case is persuasive, and there is an agreement between the parties that the charged conduct fits the elements of the crime and the Government respectfully submits that the indictment should not be dismissed.

MR. AMINOFF: Could I have a moment?

THE COURT: Of course.

MR. AMINOFF: Thank you. Just to begin with, the

fact that cert was denied in *Lee* doesn't mean anything, and I'm happy to submit briefing on that. But whether the Supreme Court denied cert in a case has no legal impact whatsoever. The Supreme Court has said that on multiple occasions. Also the Supreme Court denied cert in all of the cases I cited, so that has no significance at all.

The fact that 175 doesn't mention terrorism is akin to the fact that 229 doesn't mention terrorism. Supreme Court actions in *Bond* was based on the ambiguity of the statute. And the statute here has exactly the same ambiguity, and that's why *Bond* applies to 175.

And the Supreme Court's real concern was exactly issues like this, where the Government starts overreaching and charging people who commit actions that are typically left to the states to police with these terroristic offenses.

THE COURT: You indicate there's ambiguity. Did the Supreme Court find 175 to be unconstitutional?

MR. AMINOFF: First of all, the Supreme Court wasn't dealing directly with 175, it was 229. The Supreme Court did not decide that 229 was unconstitutional. Instead, they skipped to we're not going to discuss the constitutional issue, we'll just decide if *Bond's* actions come within the statute. I think that would be the easiest way for the Court to proceed is to find, just like in *Bond*,

that Mr. Kim's actions do not come within the statute.

And really what the Supreme Court's concern was was overreaching. That you could punish basically any use of a biological agent under this statute. That's exactly what they talked about in *Bond*.

Again, the fact that this traveled through the mail, you know, just going with what the Government said for a moment about how it was packaged and all that, this is what Mr. Kim and the agent agreed to, so it wasn't as if Mr. Kim actually had no choice. He could have said no. The agent actually said to him that he wanted to wait and ship it until his contact was at the post office because it would be better, safer, and Mr. Kim agreed to that.

But again the chemicals in *Bond* were shipped through the mail. She bought it on Amazon, so it's kind of a red herring. It doesn't mean anything.

Thank you, Your Honor.

MS. EL-AMAMY: Just briefly. There was no contact at the post office. Again that was part of an investigative strategy. Defendant Kim around the time of Thanksgiving was ordering ricin from an undercover operative. The Government had a strong interest in identifying who the potential victim was and saving their life. That requires a lot of coordination with my office and with the Department of Justice in terms of figuring out an investigative strategy

as to how to identify that individual and putting the paperwork together.

So to the extent that the undercover was saying that there was a contact at the post office, that was just to buy time. There was no contact at the post office that would make this safer.

And the Government submits that there could be no contact at the post office to make things safer for deadly toxin such as ricin.

The final point that I would make is, and this is what the defense was saying, *Bond* deals with 229, 18, U.S.C. 229, or 229, and that is a completely different provision than the provision at issue in this case.

The reason why *Bond* is so different is because it dealt with chemicals that could be found under your kitchen sink and the scope of what Congress could be regulating when putting those chemicals together would be broad, in comparison to a deadly toxin that's listed as a deadly toxin as something that should be regulated under the statute. And that is what *Lee* says and that is the distinction that is found between *Bond* and *Lee*.

And with that, the Government would submit.

THE COURT: Very well.

All right. I'll take the matter under submission.

MS. EL-AMAMY: Would the Court like to hear about

the jury instruction at this point?

THE COURT: Yes.

MS. EL-AMAMY: Your Honor, this is where we started out many, many months ago before we got to the dismissal issue, and the issue in this case is what is the proper jury instruction. And the Government submits, the proper jury instruction is one that tracks the language of the statute. Nothing more and nothing less. It's in the Government's reply brief, Document 36, on page 5, which tracks the statute and tracks the definition for use as a weapon, includes the development, production, transfer, acquisition, retention or possession of any biological toxin for other than a prophylactic, protective, bona fide research or other peaceful purpose.

Now, it's the Government's understanding that the defendant in this case is going to argue that he obtained the ricin or tried to obtain the ricin to commit suicide and that doesn't fall within what this statute controls. The statute doesn't say that one way or another.

However, what the statute does say is it defines use of the weapon as something other than a prophylactic, protective, bona fide research or other peaceful purpose. It is the Government's view that suicide does not fall into any of those categories, even if the Court were to -- even if the jury were to admit -- or accept the defendant's

argument that he intended to commit suicide.

However, the Government does acknowledge that there is no law, one way or another, saying add to the definition of free use as a weapon or to help either party.

For example, the Government points out in *Levenderis*, the Government tried to embellish or add to the definition for use as a weapon, meaning that the jury could infer that the defendant obtained ricin for use as a weapon looking at these different factors, and the Court did not accept that. The Court did not accept the Government's proposed instruction that added additional factors the jury could consider because it wasn't supported by the plain language of the statute.

In this case here too, the defense wants to add to the language of the statute. The Government submits that the most appropriate thing to do in this case and the thing to do that's most supported by the case law is to simply track the language in the statute and track the jury instruction that's in the Government's reply.

Now, if the defense wants to argue -- present evidence at trial that this was for suicide and wants to argue that that does not fall within the definition, I think that's fair at this point.

MR. AMINOFF: Thank you, Your Honor.

So the Government had actually moved to preclude

me from even arguing that suicide is a defense. It sounds like they've just withdrawn that. So I appreciate that. So now we're just talking about the jury instruction.

THE COURT: Actually we don't really need to do that here. We'll be settling the instructions at a later date.

MR. AMINOFF: Okay.

THE COURT: Anything else?

MS. EL-AMAMY: No, Your Honor. Thank you.

MR. AMINOFF: Sorry. Thank you, Your Honor.

*(Thereupon, at 11:31 a.m., proceedings adjourned.)*

-oOo-

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript format is in conformance with the regulations of the Judicial Conference of the United States.

Date: July 31, 2019

/s/ Lisa M. Gonzalez

Lisa M. Gonzalez, U.S. Court Reporter
CSR No. 5920